This is our fifth case today. It's 4-14-0769 in the Matter of Ramona Escapa v. Jefferson Callahan. Let's see, for the appellant, Attorney John Hawk. Did I say your name right? Yes. And for the appellee for the state is Attorney Jim Majors. Mr. Hawk, are you ready to proceed? Yes, I am. You may do so. May it please the court. Counsel, we're here today based on the appeal of my clients, Jefferson and Brenda Wills Callahan. My name is John Hawk, as has already been discussed, and I represent the appellants in this case, along with Counsel Chip Owens, who will not be arguing today. This stems from a complaint for civil forfeiture filed in Schuyler County in the 8th Judicial Circuit. My clients are a husband and wife that currently still reside in Rushville, Illinois. And they have three items of property that were subject to this complaint for civil forfeiture, as the court is likely well aware. A red Mazda truck, a gray trailer, and a gray Ford F-150. All three of those items of property were subject to a forfeiture. That civil forfeiture was based upon an underlying crime in which only Mr. Callahan, or Jefferson Callahan, was charged with burglary, possession of burglary tools, and theft. That case was disposed of in April of 2014 during a three-day jury trial in Schuyler County, Illinois. At the end of that trial, Mr. Callahan was ultimately acquitted. Of course, that did not prevent the state from then proceeding on a complaint for civil forfeiture, as they decided to do. And at that complaint, obviously, Brenda Wills Callahan was also subject to that forfeiture. The three items that were ultimately seized and are still in the possession of this state, a stipulation was entered in which both parties, Jefferson Callahan and Brenda Callahan, were registered owners of all three of those items of property. It should also be noted that the complaint for civil forfeiture was not based on possession of burglary tools or theft, but of burglary and only burglary. And I believe that's part of the record as we have in front of us today. The opponents have made a three-pronged argument in their brief. The first issue, and a substantial issue that has to sort of be addressed, I believe, at the outset, because it also applies to the second two arguments, is the lack of a proper stipulation between the parties. Appellate counsel was not trial counsel, but the record is fairly clear and there was an order in which a stipulation was entered between the state's attorney and defense counsel at the civil forfeiture hearing, in which it was stipulated to all the evidence presented by the witnesses during the underlying jury trial, all the trial exhibits, and then one fact that both parties, Brenda Callahan and Jefferson Callahan, were registered owners of all three items of property subject to the seizure. The issue with the stipulation became clear once the appeal was filed and when counsel was preparing that appellate brief and it came to their attention that the trial transcripts from that three-day jury trial, which are an integral part of the record and what was stipulated to in the complaint for civil forfeiture in that proceeding, were never actually prepared. So the trial court did not have access to many of those exhibits, if any, or any of the testimony of the parties. There may have been notes that were kept by the trial court and there was judicial notice taking of the file, so I'm assuming that was used in entering its order. Well, the trial judge sat through the three-day trial. Certainly, Justice. She was present. She did preside over that. Granted, that trial did take place at least three months prior to when that hearing was held and when the order was ultimately entered. But she obviously was a witness to those proceedings, so I don't know. She obviously had memories that she could testify to. But I think the problem with that stipulation is that there are certain facts contained in the ultimate order that was entered by the trial court in the civil forfeiture action that were not contained in the record and are simply inaccurate. That's why the appellants believe that the decision was against the manifest weight of the evidence, given that it was unreasonable, considering some of the facts that were listed out as true in that order or findings the trial court entered that were simply in the record were not there. Now, the appellee has raised some issues with the appellants contesting that stipulation. One of those being that we can't have our cake and eat it, too. In other words, we can't say that our clients are registered owners of all these items of property and agree with that part of the stipulation, but then object to the rest of the stipulation. We have no objection, necessarily, to that evidence being entered and considered. It's just that it simply wasn't before the court. It didn't have access to all those details, which is a three-day jury trial. There was a pretty voluminous record there and lots of details and facts, which this case turns on that were not there. So there was no transcript? The transcript was not yet prepared for any day of jury trial. Which party had the obligation to provide the court with the transcript? The record is not clear as to who was going to provide the transcript. The court did specifically state, though, in its ruling on that day that it would have the trial transcripts prepared or they would be prepared and they would be reviewed. That was not done. I don't know what party had that obligation. How long was it after the hearing on the forfeiture that the ruling was issued? I believe the forfeiture hearing was on July 9th, which consisted mostly of this argument and stipulation. And my recollection is that on August 1st, the written order was actually entered. It was sort of taken under advisement. There would be a reading of the trial transcripts and then a judgment would be issued. Now, that judgment issue contained some of the details of this case. So the trial court obviously had some recollection or some ability to recall some of those facts because it was fairly detailed on some issues. But it certainly was not prepared, which I think presents an obvious problem. And we're not saying that it shouldn't have been stipulated to because obviously it was. That is clear from the record that trial counsel intended to allow all that evidence in, even though some of it was contradictory to each other. It's somewhat strange, I think, to take and attire all the witnesses' testimony when it was contradictory and stipulate to that, but that was done nonetheless. However, those were not prepared until, I believe, in October and November, when this brief began to come together. So we believe, based on that stipulation, and there was a couple of facts in the findings that present a real problem, that being that there was additional items found in the gray Ford F-150 that were not there. For instance, the pry bar that was not actually found in there. The fact that the snow on the vehicle, upon cross-examination, it was determined there was no snow on the truck, and I'll get to why that was important here shortly. But besides the lack of a proper stipulation and evidence for the trial court to review, there's also the issue of the innocent owner defense. Now, pursuant to that stipulation, Brenda Callahan, who has a much stronger argument as being an innocent owner, even though Jefferson was ultimately acquitted, there was obviously lots of evidence there that he possibly could have been convicted on. But he was not. And with Brenda, the real piece of evidence was the fact that a shoe print of a shoe that she identified as being hers was found at the scene of the burglary. Which, to briefly go back, the burglary was at a gas station in Rushville, Illinois, and there was a shoe print found. There's no other evidence that she was actually there. The state wants to claim that perhaps it's an inference that can be made that she had to drive a second vehicle because the red Mazda truck wasn't reliable enough. Now, the red Mazda truck was plenty of evidence that that was at the scene. There was an imprint of the safe that was stolen in that red Mazda truck, and it also contained the DVR from the Airco that was stolen and a mask from the person that entered into the Airco. And that person on the video footage, which was entered into trial evidence, was certainly not Brenda Callahan, and there was no evidence stating that she was. Also, no, Brenda Callahan wasn't charged with anything. Accessory after the fact, no charges at all. Was there any evidence that someone was wearing her shoes other than her? No, there was no evidence, really. That issue wasn't dwelt upon, and certainly that... Well, she's the only one that wears her shoes. Her shoe prints at the scene. Is there an inference to be drawn from that? There is certainly an inference that can be drawn from that, Your Honor. There's no doubt about that. Now, there were lots of other individuals in the house, and if you read through the court's ruling, the trial court took issue with Ms. Callahan sort of placing blame on others in the house because this is the type of residence. There were people in and out the door all day long, extended family, friends. So while there's no direct evidence that somebody else was wearing that shoe, that issue wasn't taken up in the trial court or in the jury trial to any further extent. How did she know it was her shoe print? Exactly what did she admit to? I believe there was a shoe that they showed her during trials, my understanding, a white Nike, I believe, that they had identified that that shoe print had been made at the scene, and they asked her, is this your shoe? And she said yes. There was a shoe print expert. Well, and does the evidence show that this shoe was taken from her residence? Yes, I believe so. I believe it was found actually in her bedroom. No, no, he asked you that it was taken from her residence, and I think he's implying it was perhaps worn by somebody else. I believe. There wasn't any evidence that the shoe was taken from her bedroom, was there? Except when they took it out of the search warrant. Yeah, when I say taken, Your Honor, I meant by law enforcement. Oh, okay. I'm sorry. I missed Mr. Justice Kinnick's question. Who was the trial attorney during the jury trial for the defendant? Nigel Graham, Your Honor. Nigel Graham. He's currently the public defender in McDonough County now. Okay. And perhaps the final argument, and I personally believe the strongest, is the fact with respect to the gray Ford F-150, its lack of its connection to any type of crime. Found in that gray Ford F-150 was a charger mechanism unit to a Jaws of Life. The Jaws of Life, there was expert testimony that they were not used in any fashion to commit this burglary. In addition to that, it was unrelated completely. No evidence that the Jaws of Life were actually ever in the truck, just that the charger was. There were a set of bump keys found in the truck. I don't know if this Court is familiar with bump keys. I know I wasn't when I initially read through this evidence. Bump keys are sort of a set of keys that are used to pick locks. And, of course, you might ask, why would the appellant possess such a thing? Well, for a living, they would go to foreclosed properties, use these bump keys to sort of pick the lock, go in and change the locks for banks and other entities that would be executing foreclosures. So those keys would have been there anyways, and they had access to those. Now, the trial court took specific interest in how access was gained to the Airco gas station when it was burglarized. There was sort of evidence that, well, it could have been bump keys because it seemed that it was longer than key, but there was no pry bar. I think that's pretty tenuous to assume it was that set of bump keys that were found in that truck that would have been in there anyways because that's what they did for a living. There was no evidence that the set of bump keys found in the truck would even have fit Airco. I don't believe there was any evidence they went down and tried it, whether they were residential or commercial bump keys. It's unfortunate you don't have the video because the defense attorney argued to the jury, you've seen the video, you see how fast they get in, it had to be a key. It was probably an inside job. And then the trial judge in her written order says they're bent over and they're trying to get in and it's obvious it's not just basically a key. It is somewhat, and I can only testify to the video that I've seen, and I'm not here to present evidence today, but argument in which there was access gained, I guess somewhat rather quickly, but without the video, of course that leaves this court still in wavering as to that issue. And trial counsel also perhaps said that because the client's son actually worked there and would have had a key to the property. So with that Ford truck, there was also an argument set forth by the state that it could be assumed, or that there should be this jump in logic, that that truck had to be taken to the scene because the other truck, which we know had the safe in it, wouldn't have been able to sustain the weight of the safe that was taken. And it would have been reasonable for that to happen, even though there's no video that was ever there. And it had transmission problems. Yes. So there were certainly problems with that truck. I don't know whether they attribute that much foresight potentially to these individuals and not so much in other ways. And I think this whole case has to be... Well, except the imprint of the... Where was the imprint of the safe found? In the red truck, the other Mazda. Obviously, that's contradictory to the state's theory that you have to have another vehicle there. Yes. Other than for the transmission issue. I mean, if it started and ran well. Yes, precisely, Your Honor. I mean, it was clear that that truck did transport the safe successfully. But the gray Ford, the thought that it would have been perhaps taken there as a backup truck for some reason or another way to get out, I think is quite a jump, especially concerning the drastic consequences of a seizure itself, which the law disfavors. This isn't the typical seizure case where there's cash with drugs or a vehicle where they catch someone. There's also the additional issue of the definition or in the commission of a crime. Now, that has been stretched out to include facilitation of that crime, which we're talking about burglary. So if you're hiding items that were stolen through a burglary or kept, that can reach out and grab those from the forfeiture statute. But we're talking about bump keys and a charger for a Jaws of Life, that there's no direct evidence that those were actually used to commit the burglary. And the fact that they were stored there is not enough, especially given the fact that they would have possessed these bump keys anyways. So I think given sort of the lens. What about the Jaws of Life? The Jaws of Life were, I think, reported stolen in another incident. It wasn't charged. It wasn't part of the underlying criminal action. They happened to be found at the scene as well with the safe in that gray trailer that is part of this forfeiture. But there was expert testimony during the jury trial that the Jaws of Life were not used on the safe. Where did you say they were found? I believe the Jaws of Life were actually found with the safe in the gray trailer, not the truck. Oh, I thought you said on the scene. Sorry, no, on the safe, Your Honor. But given that lens and the fact that the law disfavors forfeiture, I think it's too tenuous to assume, especially that the gray truck was used in this burglary whatsoever. There was still snow on it. And upon cross-examination, the officer had to admit that it wasn't seen at the scene. There weren't any burglar tools necessarily in there except for bump keys. Well, how much snow was on it? Well, they're not clear on that in the record. Upon cross-examination, the officer said there wasn't as much snow on it or any. Initially on direct examination, sorry, Your Honor, and then on cross, had to admit that there was snow on the truck. There were photographs of the truck, weren't there? Entered that trial, but we didn't get them. I believe so, and I'm not sure I've actually reviewed those to determine how much snow was on there, which was part of the difficulty in obtaining these exhibits because they'd been given back to the entities that had them, so they were sort of beyond my reach to get those back and part of the file. They sound like they're pretty important. I mean, if there was a big pile of snow on it, it probably wasn't moved the night before. I could definitely see how the court would be interested in seeing a comparison between the Mazda truck and that to determine that. But clearly it was there earlier, perhaps. I don't know what kind of accumulation. We also didn't have any testimony. Maybe it was at a different angle and the wind blew it off. I don't know. There's lots of, perhaps, alternative reasons why that snow wasn't on there. But viewed through that lens, I don't believe that the state met its burden originally, and this case should be reversed, especially as to the issue of the forfeiture of the gray truck, given that it's lack of ties and it's not part of the commission of the burglary. Anything further? I don't see any other questions. We'll have more time on rebuttal, Mr. Hunt. Thank you, Judge. Mr. Majors? May it please the court, counsel? I don't know where to start. First of all, as I understand it, this Mazda is not at issue. There was a lot of discussion about it here, but it's not at issue here. The only things at issue are, one, the stipulation, the Ford truck, and whether or not Ms. Callahan is an innocent owner. I don't think this appeal has anything to do with that Mazda truck. The stipulation, there's an agreed order in the record. I think it's C-30 for the convenience of your staff. That doesn't say anything about the judge waiting for the transcripts to be prepared. I was here a few weeks ago, and my opponent was allowed to hand something up to the court. I'm hesitant to do that without the court's approval. But, again, it's at C-30. There's absolutely nothing about it. I think she says it at the end of the argument on the forfeiture case. Well, I think she… She said, well, I'll review the transcripts and something else. That's correct, Judge, but I think prior to that, unfortunately, after they agreed verbally to what I just talked about, the state's attorney got a little bit of wordy here, and he says, Your Honor, just to clear up any issues, Your Honor, I would ask the court to take, which I believe it can, just judicial notice of 13 CF-51, the criminal case. There's something that's… In case there's something not covered in that stipulation, I would ask the court to take judicial notice of any transcripts or anything that are in the file. So I think the state's attorney was saying if there's any transcripts in that file now, here and now, consider those. And then the judge says, Okay, I'll consider the transcripts. I think that clarifies that issue. But even if the court disagrees, where are they harmed? I didn't hear them explain how they're harmed. What issues, what facts are left out or put in? I think I only heard about two facts. Yeah, there were several that they mentioned in their brief, like the pry bars being located in the trunk. The pry bars were not in that Ford truck. There's no question about that. The sledgehammer was not in that Ford truck. And the orange paint on the sledgehammer did not match That's correct. That's correct. The state's not concerned about any of those tools. To get to the chase, they say there's only That's what she based her forfeiture on. It's a problem. Yeah, but you can affirm for any reason supported by the record, Your Honor. And the standard here is by a preponderance. To get to the chase on the Ford here, it was parked behind all the other cars. An officer testified the snow was melted off. Now, he was later called by defense counsel and shown some pictures and admitted that it still had some snow on it. Now, I don't know when those pictures were taken, how many hours later, whether it snowed again or not. The clear evidence is it stopped snowing at 1130. Burglary happened after that, sometime before 4 a.m. And the officer did testify there was snow melted off or blown off of that Ford. I'm not going to talk about the Mazda because it's not an issue here. There's no question that the bump keys were found inside the Ford. There's no question that Mr. and Ms. Callahan, among their other jobs, went around securing these abandoned properties or foreclosed properties. And they needed these bump keys to access the inside of those properties, to secure those properties, blow the water out of the pipelines and do whatever else they had to do to make sure that they were secure. And they both were adept at using these bump keys. They did that as their occupation or their second occupation. And when she testified, she described in detail how she used them, which is consistent with the video of at least one of the burglars using some device which took a little manipulation to get in. And there's no sign of forced entry at the gas station. Additionally, you have a lot of testimony by the defense at the trial about how this Mazda's transmission doesn't work, that there's a lot of parts in the back. They don't want the kids to drive it. They don't want to get stranded anywhere. And then you have testimony about both Ms. Callahan and Mr. Callahan testified that they drove the Ford that night and they parked it in the back. It's the last car in. And if they were out committing a burglary between 1130 and 4 o'clock in the morning, it would be the last car in. It would have some snow knocked off of it. It would have bump keys inside. And Ms. Callahan's biological son, Mr. Callahan's stepson, Wiltz, Jacob Wiltz testified, his parents came in that night and went to the back and unloaded some stuff. And in the back, in the trailer, is the safe. Jumping to Ms. Callahan's participation, there's no dispute that the right shoe was an exact match at the scene of the burglary by the VCR. The one burglar goes in, disconnects the VCR. He's always referred to as a male. I don't know. I've never seen it. I made a motion to supplement the record with photographic exhibits and it was denied. It was denied because the exhibits were no longer with the circuit clerk. They'd been returned, right? I attached the disks to my motion. They were attached to my motion. Was the disk obtained from the circuit clerk? I got it from the state's attorney's office. I had two disks. But it wasn't the disk that was actually admitted as an exhibit at the trial. It was a copy. Let's take my license on that. So you have an exact match of that right shoe print at the scene by the VCR. And during the trial, she says, those are my shoes. And I think the prosecutor gave her two chances to explain. And she said, I have no explanation. She could have said I was in the store. Somebody else wore my shoes. Whatever. And the left shoe was consistent with her shoe. And she knew how to use the bump keys. She said she drove the Ford that night. The Ford was in the back. And, again, we have the son saying they drove in at night and dropped some things off. Any questions? Do you think the disk contained the video? The disks I have, I had an IT person in our shop make all the photographs. I got a little box and a half of photographs. And I asked her to make only those which were admitted into evidence. Unfortunately, the numbers appear to be off. And then the other disk says two videos. And she wasn't able to access it. The RIT person was never able to access it. So how would we be able to access it? I attached it to my motion. I made a motion to supplement the record. And I attached both those disks. What I'm asking you, though, is if you weren't able to access them, what good does it do to attach them to your motion? How are we going to see it? I think that over the years I've noticed that SAP has the poorest equipment of anybody involved in this process. You may still be ahead of us in terms of the quality. I think the defenders had computers for 15 years before we got our first one. And we only had one. So I'm not trying to be flippant. I'm just saying we don't have state-of-the-art equipment. Tell me about the snow on the Ford versus the snow on the Mazda. Well, when the cops get there, they say that snow is missing from the Mazda and the Ford. And they went there because Jacob Wilkes used to work at that gas station. And there's a little snow missing which would fit the safe. That's why they focused on that Mazda. And my theory is nobody would take that Mazda to a burglary. And they testified that nobody would use it. It's not in the back. The Ford is. How did the input to the safe get into the Mazda? I don't know if two vehicles were taken, Your Honor. And that had a lower bed. If you look at the pictures, it's a small truck. The Ford's a big truck. So if I had to lift the safe like that myself, I would want to put it in a smaller bed. I wouldn't have to lift it so high, especially if I was in the middle of committing a burglary at 2 or 3 o'clock in the morning. I don't know if they brought the Ford back and transferred it to that so they could get around to the side of the house to put it in the trailer. Again, the standard here is by preponderance. I mean, I'm used to appearing in front of you three justices with beyond a reasonable doubt. But this is just by preponderance. Is there anything in the record indicating the value of the Mazda in the trailer and the Ford? Yeah. I have documents somewhere that show the lien holder and how much is owed on it, on the Ford. And maybe on the trailer. The Mazda, I think, is paid for. But the Mazda's like a 1998. That's why I wondered why these two high-powered lawyers are here, because it looked to me like you're talking about less than $4,000. Not that I have any expertise. Is that on the Ford? I don't see about $1,000 equity in the Ford. Again, I don't have any expertise. Okay. The trailer is not self-propelled. I don't mean any offense to anybody, but I don't know where the money is to motivate this much attention. I'm sure they're very complimented by being called high-powered lawyers. Any other questions? Anything else? All right. Rebuttal, Mr. Haack. Briefly, just to respond to some of the points made by counsel, the trial court was very clear, I believe, and I think, Justice DeFoe, you pointed out, she did indicate that the transcripts would be prepared and she would review those. I think that was always the intent of the party, and it wasn't simply that they would stipulate, and if there happened to be any transcripts, those would be reviewed. I think it was given that there were three days, I believe, from April 14th, 15th, and 16th, of testimony from the witnesses and the amount of details, that there was an understanding between the parties, which is the basic stipulation, that those transcripts would be prepared to aid the court in its decision. In addition to that, with regarding the disk, I think we simply made the objection because the disk wasn't attached to the copy we received, so I'm not sure exactly what photos would have been on there or what they would have indicated, because we did not see that specific disk that was sent to us. I just want to make that sort of clear for the record. It seems like we're doing a lot of guessing at perhaps strategies that would-be burglars would have used, or successful burglars, if you want to call them that, and how they would have gotten there, what they would have used, or the height of the trucks and things like that. I realize that the burden is only by a preponderance of the evidence, but given the drastic consequences of taking away these three items of property, I believe if we're making guesses like that, that perhaps that burden hasn't been met and there should be some sort of better evidence than that, given that this statute was supposed to be construed in favor of the legal subject of the court. And just to touch briefly on the vehicles, I mean the Mazda and the trailer, obviously they have more relationship to the burglary than the truck does, but they are part of this appeal, and this court would have the ability to sort of reach out, and through that innocent owner exception, to essentially allow for those to be returned to the appellants. And with regards to the value of the vehicles, the Ford truck, I don't believe it had much as far as equity goes, but it is a very valuable vehicle. I think it was a brand new 2013, just happened to have a lot of debt against it, which, while not part of the record, my clients have been having to continue to pay that, so it wouldn't be repossessed by the creditor. And I think really specifically with that Ford truck, as the state admits, that sledgehammer was not in there, those pry bars were not in there, that is clear from the record, even though I believe that the trial court did seem to believe there were additional items in that truck that simply weren't there. And I don't believe that the bump keys and the charger for an unrelated item that was stolen had anything to do with the underlying crime, and do not bring that truck within the commission of the burglary, and therefore the trial court should reverse it. What about the response to the... Mr. Majors indicated that the... Mrs. Jefferson's biological son testified that his mother and his stepfather came in after being out that night and unloaded some stuff. Is that accurate? I believe that is accurate. I think that's pretty much exactly what... Okay, what about the timing of that? Is it 10 o'clock at night, or is it 2 o'clock in the morning? I believe it was much earlier than 2 o'clock in the morning. I think it was around that evening when he was still awake. I think that that testimony was not crystal clear that they were there at 957. I was watching a game on television or anything like that. Just simply, they arrived and unloaded some stuff. So it really wasn't clear that he didn't say they arrived, and I saw them leading over a large orange object and moving it around. Well, I mean, the timing of it, at all. The TV's up, and the TV's on, and it hadn't stopped snowing yet. That's a lot different than 2 or 3 in the morning, which one would assume when this burglary may have occurred, or my misunderstanding. I don't know... It was closing time. Exactly. It was sometime after closing time when the burglary did take place. And I believe it closed at 11 p.m. And I'm not crystal clear. And sure, I wouldn't want to misstate that fact. If he did testify to an exact time, I don't believe they were able to pin him down on what exactly he saw. So would it be accurate to say that the evidence against her is marital status, co-ownership, access to bump keys. The bump keys themselves don't necessarily lend suspicion. But the ability to use them and have them available when they might have been used in a crime, you could draw some inference from that. And she was out sometime that evening, apparently. Based on her son's testimony. Sometime that evening. But without a definitive indication of the time. Yeah, I believe that is very accurate, and of course relevant to her position as an innocent owner. Although I will say with the bump... And the shoe print. And the shoe print. But I will say with the bump keys... Sorry. Go ahead. It was more so an issue of her husband. I think it was testimony. He's the one they said was proficient. Jefferson. With the bump keys. Not necessarily her. Thank you, counsel. We take this matter under advisement and stand in recess.